UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DOUG BRIGGS, DARCY KOVACS,<br><br>Plaintiffs,<br><br>v.<br><br>LIFE CARE CENTERS OF AMERICA, INC., LAKE VUE OPERATIONS, LLC, TODD FLETCHER, ELLIE BASHAM,<br><br>Defendants. | CASE NO. C21-740 MJP<br><br>ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO SEAL |

This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt. No. 40) and Plaintiffs' Motion to Seal (Dkt. No. 44). Having reviewed the Motions, the Responses (Dkt. Nos. 43, 47), the Reply (Dkt. No. 48), and all supporting materials, the Court DENIES in part and GRANTS in part Defendants' Motion for Summary Judgment and DENIES Plaintiffs' Motion to Seal.

**BACKGROUND**

This matter involves two consolidated actions filed by the relatives and executors of the estates of two individuals who were residents at a Life Care Centers of America (LCCA) facility in Kirkland who died from COVID-19 exposure in early 2020. Plaintiffs have sued the corporate entities that own and manage the facility in Kirkland (LCCA and Lake Vue Operations, LLC), as well as the executive director of the Kirkland facility and the Vice President of Western Operations of LCCA. Plaintiffs pursue claims of medical negligence, wrongful death, special survival violations of the Abuse of Vulnerable Adults Act (RCW 74.34) (AVAA), fraud, negligent misrepresentation, and Washington Consumer Protection Act (CPA) claims.

The underlying facts concern Barbara Dreyfuss and Robin Hamrick, who were residents of Life Care of Kirkland (LCCK), a skilled nursing and rehabilitation facility owned by LCCA. In early 2020, both Dreyfus and Hamrick died from exposure to COVID-19. Plaintiffs allege that Dreyfus and Hamrick were negligently exposed to COVID-19 while living in the facility and that Defendants' negligence was a proximate cause of their exposure and death. (Compl. ¶¶ 5.1 – 5.2.) Plaintiffs also contend that Defendants fraudulently concealed or negligently misrepresented information material to their safety. (Id. ¶¶ 6.1 - 6.10.) In their complaints, Plaintiffs suggest that Defendants misleadingly represented that they would utilize best practices to identify, mitigate the risk of, and respond to infectious diseases. (Id. ¶¶ 9.2 - 9.3.)

Defendants now seek summary judgment on all of Plaintiffs' claims. They assert that there is inadequate evidence to support Plaintiffs' negligence, wrongful death, special survival, and AVAA claims. They also seek summary judgment on Plaintiffs' fraud, negligent misrepresentation, and CPA claims on different grounds. To frame the issues, the Court reviews the salient facts surrounding the COVID-19 pandemic's early days, the safety protocols at

LCCK, the outbreak of illness at LCCK, Plaintiff's deaths, and Plaintiffs' expert's opinion and testimony about causation.

**A.  Pandemic Outbreak**

January 2020 marks the early days of outbreak of the COVID-19 virus. On January 8, 2020, the Centers for Disease Control and Prevention (CDC) issued an official advisory about a pneumonia outbreak of unknown etiology from Wuhan, China. (Declaration of Brian D. Ernst Ex. C. (Dkt. No. 41).) Defendants became aware of the existence of COVID-19 in January, 2020. (Deposition of Alice Cortez as Rule 30(b)(6) deponent of LCCA at 40-41 (Declaration of Leslie Pescia Ex. A (Dkt. No. 43-2 at 7-8)).) On January 17, 2020, the CDC provided guidance to evaluate patients for COVID-19. (Ernst Decl. Ex. D.) The guidance stated that the provider should immediately notify their infection control personnel at their healthcare facility and their local or state health department if the patient showed fever and/or signs/symptoms of lower respiratory illness and had been in China or been in close contact with a confirmed case of the novel coronavirus. (Id.) And on January 21, 2020, the Seattle Times reported on the first known case of COVID-19 exposure in the State (in Snohomish County). (Id. Ex. E.)

In a news conference on January 28, 2020, Secretary of the Department of Health and Human Services, Alex Azar, opined that while Americans should know that COVID-19 is a "potentially very serious public health threat . . . Americans should not worry for their own safety." (Ernst Decl. Ex. F.) And as of February 19, 2020, Public Health Seattle & King County (the "Health Department") advised residents that "travelers to and from certain areas of the world may be at increased risk" for contracting the "novel coronavirus." (Id. Ex. G.) The Health Department advised that the "novel coronavirus has not been spreading widely in the United States" and that "there are no additional precautions recommended for the general public." (Id.)

### B. Safety Protocols at LCCK

As of January 2020, Defendant LCCA, which owns LCCK, had in place a policy for Outbreak Control and Management, that Plaintiffs suggest was ignored. The policy stated:

> If an outbreak is identified, the facility must:
>
> • Take the appropriate steps to diagnose and manage cases, implement appropriate precautions, and prevent further transmission of the disease as well as documentation of follow-up activities in response; and
>
> • Comply with state and local public health authority requirements for identification, reporting, and containing communicable diseases and outbreaks.

(Pescia Decl. Ex. M (Dkt. No. 45).) The policy defined an outbreak as "an occurrence of more cases than expected in a given area or among a specific group of people over a particular period of time." (Id.) And it specifically explained that "[a]n Influenza outbreak should be considered when there is a single laboratory confirmed case or there is a sudden increase of acute febrile respiratory illnesses over the normal rate of infections." (Id.) The policy further specified various ways in which to investigate the outbreak, including designing and evaluating control measures and analyzing the outbreak. (Id.)

LCCA also had in place a specific outbreak and management policy for influenza and flu outbreaks. (Pescia Decl. Ex. O (Dkt. No. 46).) The policy required the facility to report signs and symptoms to a physician for early intervention. (Id. at 4.) The policy stated that "influenza testing should occur when any resident has signs and symptoms that could be due to influenza and especially when 2 or more residents develop respiratory illness within 72 hours of each other." (Id.) The policy also required adherence to a protocol that included starting "droplet precautions" for anyone believed or confirmed to have influenza, which included isolating those residents and stopping group activities and group dining. (Id. at 5.) And the policy required daily surveillance and notification to the local and state health departments. (Id.)

### C.    LCCK Outbreak

Alice Cortez, a licensed practical nurse, was the infection preventionist at LCCK and had received specialized training in infection control and prevention in the skilled nursing home setting. (Ernst Decl. Ex. H (Cortez Dep.) at 16, 22-24.) Cortez created daily line listings, which are reports used to identify and track patients who demonstrate symptoms of infection and receive antibiotics to treat infections. (Ernst Decl. Ex. J at 11 (Expert Report of Connie Cheren, RN, MSW)) (Dkt. No. 41-10 at 12).) She personally became aware of the COVID-19 virus in January 2020 and the presence of the virus in Washington State. (Cortez Dep. at 40-41.) LCCK made no changes to the policies and procedures in response to COVID-19 in January and February 2020, except to change a policy on the use of plastic, disposable utensils in February 20200. (Id. at 83.)

In January 2020, Cortez noted an increase in respiratory problems in the residents at LCCK, which she identified from daily surveillance. (Cortez Dep. at 33.) But she did not initiate any of the influenza protocols and none of the residents who were sick were isolated. Defendants note that Cortez did provide training during an all-staff meeting in January 2020 on coronavirus (not specific to COVID-19), flu, and influenza. (Id. at 50.) And Defendants note that at this time, LCCK could not request COVID-19 testing unless the patient had lower respiratory illness and either a history of recent travel to China or close contact with someone with a confirmed COVID-19 infection. (Ernst Dec. at Ex. D.)

On February 26, 2020, Cortez noted an increase in residents with fevers and respiratory symptoms and was concerned there was an outbreak. (Cortez Dep. at 38, 65-66.) Cortez discussed the symptoms with the Medical Director at LCCK and performed flu tests on those with acute fever, all of which were negative for flu. (Id. at 37-38.) Cortez also contacted the

Health Department. (Id. at 39.) And on February 26, 2020, Defendants began implementing infection prevention and control procedures such as cancelling group activities. (Id. at 96-100.) But a pre-planned Mardi Gras celebration still occurred on February 26, 2020. (Id.)

**D.     Plaintiffs' Exposure to COVID-19 and Death**

On February 27, 2020, on Cortez's recommendation, Dreyfuss was transferred to hospital after being found in respiratory distress. (Cortez Dep. at 73-74.) Dreyfuss died on March 1, 2020, and her death certificate lists the causes of death as: (1) adult respiratory distress syndrome, (2) pneumonia, and (3) COVID-19. (Pescia Decl. Ex. I.) On March 8, 2020, Hamrick was transferred to hospital. (Pescia Decl. Ex. J.) Hamrick died on March 14, 2020, and the hospital notes note the immediate cause of death as "[a]cute respiratory failure secondary to COVID-19 positive. (Id. at 3.)

**E.     Plaintiffs' Expert on Causation**

Plaintiffs have retained John Cascone, M.D., to opine on the medical standard of care and the cause of Plaintiffs' exposure to COVID-19. In his written expert opinion, Dr. Cascone opines that the standard of care required LCCK by February 7, 2020 to have acknowledged an influenza outbreak, implement the influenza protocol, and isolate sick residents. (Cascone Report at 13 (Ernst Decl. Ex. Q at 14 (Dkt. No. 41-17 at 14)).) He concludes that LCCK failed to recognize and acknowledge an outbreak of respiratory tract infections by February 7, 2020 and to follow its own influenza protocol. (Id.) He also opines the LCCK failed to cohort patients with respiratory tract infections and isolate residents. (Id.) He concludes that "[a]s a direct and proximate result of LCCK's failures, Ms. Dreyfuss was infected with SARS-CoV-2 on or about February 20, 2020" and that "[a]s a direct and proximate result of LCCK failures, Ms. Hamrick was infected with SARS-CoV-2 on or about February 26, 2020." (Id.)

Dr. Cascone's deposition testimony provided more detail in support of written opinion. He explained that LCCK should have implemented the influenza protocol and isolated sick residents by January 31, 2020. (Cascone Dep. at 80-81.) According to Cascone, had LCCK done so, it would have noted that there was spread of the disease among the asymptomatic population even though the sick residents were isolated. (Id. at 80-83.) Given the asymptomatic spread, Cascone opines that LCCK should have then locked down all residents in the facility by mid-February 2020. (Id. at 80-83.) According to Cascone, Defendants' failure to take these steps fell below the standard of care and, more likely than not, caused Dreyfus's and Hamrick's exposure to COVID-19. (See id. at 102, 112.) Cascone believes Dreyfus was exposed to COVID-19 on February 19 or 20, 2020 (id. at 112), while Hamrick was likely exposed on February 28, 2020 or March 1, 2020 (id. at 101). This aligns with his view that a full lock down by mid-February would have avoided Plaintiffs' exposure. (Id. at 107-08.)

Defendants point out that Cascone also admitted that he does not know who exposed Plaintiffs to COVID-19 or how they were exposed. (Cascone Dep. at 101, 106, 112.) Cascone also testified that even if Defendants had locked down the facility, they could not have completely mitigated the spread of COVID-19. (Id. at 106.) And Cascone admits that LCCK could not have stopped the initial introduction of COVID-19 into its facility even if it followed the standard of care. (Id. at 80.)

## ANALYSIS

**A.   Legal Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

1  an issue of fact exists, the Court must view all evidence in the light most favorable to the
2  nonmoving party and draw all reasonable inferences in that party's favor. <u>Anderson v. Liberty</u>
3  <u>Lobby, Inc.</u>, 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is
4  sufficient evidence for a reasonable factfinder to find for the nonmoving party. <u>Id.</u> at 248. The
5  moving party bears the initial burden of showing that there is no evidence which supports an
6  element essential to the nonmovant's claim. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).
7  Once the movant has met this burden, the nonmoving party then must show that there is a
8  genuine issue for trial. <u>Anderson</u>, 477 U.S. at 250. If the nonmoving party fails to establish the
9  existence of a genuine issue of material fact, "the moving party is entitled to judgment as a
10 matter of law." <u>Celotex</u>, 477 U.S. at 323-24.

11 **B.      Sufficient Evidence of Causation to Sustain the Medical Negligence Claims**

12         "In Washington, plaintiffs in a medical malpractice action must prove two key elements:
13 (1) that the defendant health care provider failed to exercise the standard of care of a reasonably
14 prudent health care provider in that same profession and (2) that such failure was a proximate
15 cause of the plaintiff's injuries." <u>Frausto v. Yakima HMA, LLC</u>, 188 Wn.2d 227, 231 (2017)
16 (citing RCW 7.70.040). Expert testimony is generally necessary to establish the standard of care
17 and the expert "must have 'sufficient expertise in the relevant specialty' such that the expert is
18 familiar with the procedure or medical problem at issue." <u>Id.</u> at 232 (quoting <u>Young v. Key</u>
19 <u>Pharm., Inc.</u>, 112 Wn.2d 216, 229 (1989)).

20         "To establish causation, the plaintiff must show that the alleged breach of the standard of
21 care 'was a proximate cause of the injury complained of.'" <u>Frausto</u>, 188 Wn.2d at 232 (quoting
22 RCW 7.70.040(2)). "[E]xpert testimony is always required except in those few situations where
23 understanding causation 'does not require technical medical expertise.'" <u>Id.</u> (quoting <u>Young</u>, 112

24

1  Wn.2d at 228 (giving the examples of "amputating the wrong limb or poking a patient in the eye
2  while stitching a wound on the face")). And the "medical testimony must demonstrate that the
3  alleged negligence 'more likely than not' caused the later harmful condition leading to injury;
4  that the defendant's actions 'might have,' 'could have,' or 'possibly did' cause the subsequent
5  condition is insufficient." Attwood v. Albertson's Food Ctrs., Inc., 92 Wn. App. 326, 331 (1998)
6  (quoting Merriman v. Toothaker, 9 Wn. App. 810, 814 (1973)).

7  Although somewhat attenuated, Plaintiffs' evidence of causation is sufficient to survive
8  summary judgment. Dr. Cascone has provided an expert opinion both on how LCCK failed to
9  follow a standard of care and how that failure, on a more likely than not basis, led to Plaintiffs'
10 exposure to COVID-19. Cascone's written opinion is quite blunt: "[a]s a direct and proximate
11 result of LCCK's failures, Ms. Dreyfuss was infected with SARS-CoV-2 on or about February
12 20, 2020" and "Ms. Hamrick was infected with SARS-CoV-2 on or about February 26, 2020."
13 (Dkt. No. 41-17 at 14.) Dr. Cascone's deposition testimony illuminated what he believes that
14 standard of care is and how Defendants failed to meet it. Specifically, he believes that LCCK
15 should have been aware of an influenza outbreak by at least January 31, 2020, and implemented
16 its protocol of isolation of sick individuals. Had it done so, it would have recognized that there
17 was spread of disease among the asymptomatic population and fully locked down the facility and
18 its residents by February 14, 2020. (Cascone Dep. at 80-83.) According to Cascone, on a more
19 likely than not basis, LCCK's failure to impose the lockdown by mid-February led to both
20 Plaintiffs' exposure to COVID-19 and their deaths. (Cascone Dep. 101-02, 112.)

21 Although the causal link requires piecing together two separate failures to follow
22 outbreak policies, the Court finds that the evidence—construed in Plaintiffs' favor—is sufficient
23 to survive summary judgment. While Defendants have elicited testimony from Cascone about
24

other possible causes, he has consistently maintained why he believes the more-likely-than-not cause of Plaintiffs' exposure was Defendants' failure to follow the standard of care. It will be for the trier of fact to determine whether his opinion is persuasive in light of all of the evidence that may be presented on this issue. The Court DENIES the Motion as to this claim.

**C.     Dr. Cascone Satisfies Rule 702's Requirements**

Defendants challenge Dr. Cascone's qualification under Daubert to be an expert on causation and the applicable medical standards. The Court disagrees.

Under Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 "establishes a standard of evidentiary reliability." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590 (1993) It "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." Id. at 592. And on a motion to exclude an expert, the trial judge performs a gatekeeping role to determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." Id. The court's assessment "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). The party seeking to offer expert testimony has the burden to establish that the testimony

is admissible. See Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council, 683 F.3d 1144, 1154 (9th Cir. 2012).

The Court finds that Dr. Cascone's opinions are admissible because they are based on his expertise, knowledge, and review of the record. Cascone is a medical doctor with experience as an infectious disease physician and he is currently a medical director at three nursing homes in Missouri. (Cascone Dep. 13, 18-20, 24; Ex. 3 to Cascone Dep. (Dkt. No. 43-19 at 26-28).) His expertise informs his opinions concerning the influenza protocols at issue and he also relies on the CDC's guidance for influenza outbreak. Cascone's opinions are not improper speculation even though COVID-19 is a novel coronavirus and was not well understood at the time of Dreyfus's and Hamrick's exposures. Instead, he opines that given the influenza-like symptoms that residents presented, the facility should have implemented its influenza protocols and ultimately locked every resident down before each Plaintiff was exposed. (See, e.g., Cascone Dep. at 79-81.) While the influenza protocols do not target COVID-19, according to Cascone, they would have prevented Plaintiffs' exposure to COVID-19 had they been followed. The Court finds no basis to exclude his testimony and DENIES the Motion as to this issue.

**D.      AVAA, Wrongful Death, and Special Survival Claims Remain Viable**

Defendants seek summary judgment on Plaintiffs' AVAA, wrongful death, and special survival claims on the theory that there is insufficient evidence of proximate causation. But as explained in the Court's analysis of the medical negligence claim, there is sufficient evidence of proximate cause. This same analysis applies to these three claims. The Court DENIES the Motion as to these claims.

### E.      CPA Claims Must be Dismissed

Defendants seek summary judgment on Plaintiffs' CPA claims, asserting that personal injuries are not actionable under the CPA. The Court agrees.

The CPA allows anyone who has been "injured in his or her business or property by a violation" of the CPA to bring a civil action in which she may recover actual damages, trial costs, and attorneys' fees. RCW 19.86.090. To state a prima facie claim under the CPA, a plaintiff must "establish five distinct elements: (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780 (1986). "Personal injury damages, however, 'are not compensable [damages] under the CPA" and do not constitute injury to business or property." Ambach v. French, 167 Wn.2d 167, 173 (2009) (quoting Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 317-18 (1993)). That is because "[t]he legal definition of 'property' appears to have narrowed over time and does not include rights to one's person or body[.]" Id. at 172.

In this action, Plaintiffs appear to seek only damages for personal injuries and they have not identified any damage to property or business. Indeed, in responding to the Motion, Plaintiffs fail to provide any direct opposition, focusing instead on causation. This misses the point. Even if there is evidence of causation, claims of personal injury are not cognizable under the CPA. See Ambach, 167 Wn.2d at 173. The Court therefore GRANTS the Motion as to the CPA claims and GRANTS summary judgment in Defendants favor on the CPA claims.

**F.      Plaintiffs' Fraud and Negligent Misrepresentation Claim Are Flawed**

Defendants argue that Plaintiffs' fraud and negligent misrepresentation claims must be dismissed because the medical negligence statute requires that all claims related to injuries from health care must be brought under RCW 7.70.030. Defendants also contend that Plaintiffs have failed to identify any facts to support the claims. The Court agrees.

Washington courts have "conclude[d] that whenever an injury occurs as a result of health care, the action for damages for that injury is governed exclusively by RCW 7.70." Branom v. State, 94 Wn. App. 964, 969 (1999). RCW 7.70.030 provides:

> No award shall be made in any action or arbitration for damages for injury occurring as the result of health care which is provided after June 25, 1976, unless the plaintiff establishes one or more of the following propositions:
>
> (1) That injury resulted from the failure of a health care provider to follow the accepted standard of care;
>
> (2) That a health care provider promised the patient or his or her representative that the injury suffered would not occur;
>
> (3) That injury resulted from health care to which the patient or his or her representative did not consent.
>
> Unless otherwise provided in this chapter, the plaintiff shall have the burden of proving each fact essential to an award by a preponderance of the evidence.

RCW 7.70.030. The medical negligence statute, RCW 7.70, "sweeps broadly." Branom, 94 Wn. App. at 969. Washington courts have defined "health care" broadly to mean "the process in which [a physician is] utilizing the skills which he had been taught in examining, diagnosing, treating or caring for the plaintiff as his patient." Id. at 969-70 (quoting Estate of Sly v. Linville, 75 Wn. App. 431, 439 (1994)).

The Court finds that Plaintiffs' fraud and negligent misrepresentation claims must be brought under the medical negligence statute. The claims all concern the failure to provide health care and must be brought as medical negligence claims. Plaintiffs argue that their fraud claim

does not encompass health care, but instead focuses on Defendant LCCA's corporate office that concealed information from Plaintiffs in January and February 2020. (Opp. at 13-14.) But this evidence—which Plaintiffs fail to identify with specificity—all concerns to the provision of health care. These claims fall within the broad sweep of RCW 7.70.

Additionally, Plaintiffs have failed to identify what specific information was omitted or misrepresented. There are no explanations or specific citations to evidence that was omitted and how that concealed non-health-care-related information proximately caused Plaintiffs' injuries. There is therefore a substantive failure of proof to sustain either claim even if RCW 7.70 did not apply. Accordingly the Court GRANTS the Motion and GRANTS summary judgment in Defendants favor on the fraud and negligent misrepresentation claims.

Plaintiffs also argue that Tennessee law should apply to resolving these claims because there is an actual conflict between the punitive damage remedies under Washington and Tennessee law. But as Defendants point out, the substantive requirements to plead and prove a claim of fraud and negligent misrepresentation are the same under both fora's law. Compare Ross v. Kirner, 162 Wn.2d 493, 499, 172 P.3d 701 (2007) (negligent misrepresentation) and Baertschi v. Jordan, 68 Wn.2d 478, 482-83 (1966) (fraud) with Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 311 (Tenn. 2008). Because Plaintiffs have failed to provide evidence sufficient to sustain either claim under Tennessee or Washington law, any conflict between the jurisdictions is irrelevant. Defendants are entitled to summary judgment under both Washington and Tennessee law.

**G.      Motion to Seal**

With their opposition, Plaintiffs filed copies of LCCA's policies regarding outbreaks and influenza outbreaks. (Pescia Decl. Exs. M & O.) Plaintiffs have asked for leave to file the

documents under seal because they were provided to them by Defendants and they were marked as confidential pursuant to the Stipulated Protective Order. The Court DENIES the Motion.

The party seeking to keep material filed under seal must meet either the "good cause" or "compelling interest" standard. See <u>Ctr. for Auto Safety v. Chrysler Grp., LLC</u>, 809 F.3d 1092, 1101 (9th Cir. 2016). The "compelling interest" test applies if "the motion [related to which the materials are filed] is more than tangentially related to the merits of a case." <u>Id.</u> Here, the compelling interest standard applies because the motion concerns the merits of the case. "Under this stringent standard, a court may seal records only when it finds a compelling reason and articulate[s] the factual basis for its ruling, without relying on hypothesis or conjecture." <u>Id.</u> at 1096-97. The court must "conscientiously balance[ ] the competing interests of the public and the party who seeks to keep certain judicial records secret." <u>Kamakana v. City & County of Honolulu</u>, 447 F.3d 1172, 1179 (9th Cir. 2006). Examples of compelling reasons include when a court record might be used to "gratify private spite or promote public scandal," to circulate "libelous" statements, or "as sources of business information that might harm a litigant's competitive standing." <u>Nixon v. Warner Commnc'ns, Inc.</u>, 435 U.S. 589, 598-99 (1978).

Neither party has provided any reason to seal the records. Plaintiffs' Motion to Seal articulates no basis to seal the records other than the fact that Defendants marked them as confidential. (Mot. at 2.) But it was not Plaintiffs' burden. Instead, because Defendants claim the documents are confidential, Defendants bore the burden to show that compelling interests outweigh the public's right of access. See <u>Ctr. for Auto Safety</u>, 809 F.3d at 1101. Defendants fell far short of meeting their burden. Defendants' brief states in full: "Defendants do not object to the relief requested in Plaintiffs' Motion to File Exhibits Under Seal." (Resp. at 2.) There is no

evidence filed in support of the motion and no reason articulated in the briefing. Accordingly, the Court DENIES the Motion and UNSEALS Dkt. Nos. 45 and 46.

## CONCLUSION

Having considered the evidence in the light most favorable to Plaintiffs, the Court finds sufficient evidence of causation to allow Plaintiffs' medical negligence, AVAA, wrongful death, and special survivor claims to proceed to trial. As to these claims, the Court DENIES the Motion for Summary Judgment. But the Court finds that Plaintiffs' CPA, fraud, and negligent misrepresentation claims suffer from fatal defects and evidentiary gaps. The Court GRANTS summary judgment in Defendants' favor as to these claims. On this basis, the Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.

The Court DENIES the Motion to Seal and UNSEALS Dkt. Nos. 45 and 46.

The clerk is ordered to provide copies of this order to all counsel.

Dated January 27, 2023.

Marsha J. Pechman
United States Senior District Judge